238 So.2d 635 (1970)
THE FLORIDA BAR, Complainant,
v.
Robert J. RANDOLPH, Respondent.
No. 39099.
Supreme Court of Florida.
July 15, 1970.
*636 Robert Jackson, of Jackson & Clem, Vero Beach, for The Florida Bar, complainant.
L.A. O'Laughlin, Jr., Ft. Pierce, for respondent.
THORNAL, Justice.
By petition for review, Robert J. Randolph, a member of The Florida Bar since 1948, asks us to reverse a disciplinary judgment filed by the Board of Governors.
Our primary concern is whether the recommended two year suspension plus additional collateral penalties is too severe in the light of the record and the long delays which have occurred in prosecuting the matter.
On July 6, 1957, Randolph was named trustee of an inter vivos trust created by Marjorie A. Holloway. He was also named executor of her estate. He qualified as executor when Mrs. Holloway passed away suddenly on February 26, 1958. He administered the trust until he resigned on June 11, 1962. He had resigned as executor in April 1962. Disciplinary proceedings were initiated against him by the two beneficiaries of the trust when a complaint was lodged with the local grievance committee on August 14, 1963. The transgressions alleged were committed during 1958, 1959, 1960 and a part of 1961. They consisted mainly of charging excessive fees; the mishandling of trust funds such as investments without adequate security; the loan of trust monies to business associates; using trust assets as security for another client's supersedeas bond and the administration of the trust in a completely irresponsible manner.
The referee who ultimately ruled in the matter made seventeen specific findings of various acts of mishandling of trust assets. There was no finding of any larcenous misappropriation of funds, although there was some indication that trust assets in some indefinite amount had been used for the personal benefit of Mr. Randolph while serving as trustee. Illustrative of some of the specific misprisions found to have taken place were: (1) lending trust funds to a friend on an unsecured note resulting in a trust loss of $2,500.00; (2) lending trust funds to a corporation controlled by respondent, his law partner and a third party. On this transaction the trust lost about $250,000.00; (3) lending trust funds to a party named Oakowsky which produced a loss of $30,000.00; (4) lending funds to an electric company in which respondent and his son-in-law had an interest; (5) investing trust money in a development company with a loss of $15,000.00; (6) pledging $500,000.00 worth of trust securities to secure a $200,000.00 supersedeas bond for another client. Although the venture involved a high degree of risk, the trust suffered no loss; (7) speculative investments in real estate resulting in indeterminable losses; (8) commingling of trust funds with personal funds; (9) failure to keep proper records and causing the beneficiaries to incur legal expenses unnecessarily.
The foregoing findings based on the record illustrate the grossly irresponsible, and indeed almost willfully abusive manner in which this trust was administered. However, *637 there was no finding of dishonesty. It was more the handiwork of a fool than a knave. Strangest of all, despite the severe losses suffered by the trust because of maladministration, the corpus actually increased in value substantially during respondent's tenure. This, as the referee held, does not excuse the breaches.
Because of the unreasonable lapse of time which was permitted to transpire between the initial charge and the eventual judgment, bar counsel offered to stipulate to a public reprimand. The referee refused to accept this. He found respondent guilty of a violation of Integration Rule 11.02(4), Canon 11 of the Canons of Professional Ethics, 33 F.S.A., and Rules 127 and 128 of the Additional Rules Governing the Conduct of Attorneys in Florida. These all deal with the improper handling of trust funds. He recommended that respondent be suspended from the practice for ninety days; that he make restitution of all amounts used for his personal benefit, and pay the costs. It was impossible to determine from the record the amount supposedly used for the personal benefit of respondent and bar counsel was requested to supply this figure.
The Board of Governors concurred in the findings but increased the period of suspension to two years, ordered payment of costs, by respondent in the amount of $778.28 "and that he make restitution and demonstrate his rehabilitation before resuming the practice of law." We have yet to be informed as to the amount of money which the Bar claims that the respondent converted to his own use. The matter is now here to review this judgment.
At the outset it is important that we present an exact chronology of events in the prosecution of this disciplinary matter. It is as follows:
 August 14, 1963 Initial complaint filed with Grievance Committee
 December 3, 1965
 January 14, 15, 1966 Hearings before Grievance Committee
 March 17, 1966 Report of Grievance Committee filed
 May 15, 1966 Finding of probable cause
 May 24, 1966 Appointment of Bar Counsel and a Referee
 July 20, 1966 Appointment of a substitute Referee
 August 12, 1966 Complaint filed
 September 17, 1966 Answer filed
 June 6, 1967 Proceedings continued because of Referee's travel
 schedule
 December 12, 1967 Letter of recusal of substitute Referee
 February 15, 1968 Appointment of another substitute Referee
 January 23, 1969 Resignation of Referee
 April 11, 1969 Appointment of Harry A. Johnston, substitute Referee
 April 25, 1969 Hearing before Referee Johnston
 July 7, 1969 Referee's report filed
 September 18, 1969 Final action by Board of Governors
We do not wish to appear unduly critical of the unexplained unreasonable delays and the apparently slip-shod manner in which this proceeding was handled. Fortunately it is an exceptional case in this regard. Because of the decision which we hereafter announce it should be noted that six years elapsed between the initial complaint and final action by the Board of Governors. There were four referees any one of whom *638 could have brought the matter to conclusion years ago. When eventually it was referred to Hon. Harry A. Johnston, a long experienced member of the Bar, it was handled with efficiency and dispatch. Incidentally, bar counsel who handled the matter in this Court was not the one who had previously been responsible for prosecution of the complaint. We realize that the unpleasant duty of serving as referee and bar counsel in these disciplinary matters is laborious, time-consuming and financially uncompensated. It is one of the contributions that a lawyer can make to the welfare of his profession. It is all volunteer work. In fairness to all concerned, if a lawyer is not able to devote the time required to handle the chore it would be much better that he decline the responsibility at the outset or request that his name be eliminated from the list of those who have volunteered to serve.
In the instant matter the respondent points out that for more than six years he has been exposed to the agonizing ordeal of investigations, charges and hearings. During this time he and his family have been subjected to the stigma of community suspicion and criticism. He comes to this Court with the repentant spirit of one who has tried to hold his head high under awesome professional embarrassment generated by charges of serious breaches of ethics. He concedes that even if some of the charges of mismanagement have been established, there has been no showing of dishonesty or infamy. He pleads that he has suffered enough and that neither the public nor the profession would profit from the prescription of added punishment.
To a point we are sympathetic to respondent's appeal. Such inordinate delays are indeed unfair and even unjust to the one accused. They permit violators to remain active in the practice. They dim the memories of witnesses. They mar effective and efficient enforcement of the canons of ethics. Worst of all, perhaps, they undermine the public confidence in the bar's announced determination to keep its own house in order.
Within the past year The Florida Bar has accomplished, with Court approval, a revision of the disciplinary article which should eliminate many of the "built-in" delays previously existing. This is confirmed by the annual report of out-going Bar President Mark Hulsey, Jr., where he remarked: "The new disciplinary procedures have far exceeded our expectations during this first year of operation. The time involved has been dramatically reduced. * * * Lawyers and the public are far better served under this new Article XI to the Integration Rule." The Florida Bar Journal Vol. 44, No. 6, p. 323 (June 1970). It is encouraging to note that the new Bar President Burton Young accepted the challenge when, in his initial report to the Bar, he stated:
"When one of our members takes advantage of his office, he deserves the wrath and sternest sanctions of his colleagues. We cannot  nor will we  tolerate the dishonest lawyer. Accordingly, with the powers of the new Disciplinary Rule, those who would trespass upon our ethics can expect to be called on to account immediately. There will be no more two-and-a-half-year delays. Final disciplinary action will be complete within approximately six months." The Florida Bar Journal, supra, p. 327.
We have repeatedly announced that disciplinary proceedings should be handled with dispatch. In cases of flagrant delays, such as the matter sub judice, we have held that years of exposure to public scrutiny and criticism supplemented by clear evidence of rehabilitation, justify a terminal penalty that otherwise perhaps would be considered inadequate. The Florida Bar v. King, 174 So.2d 398 (Fla. 1965); State ex rel. Florida Bar v. Rubin, 142 So.2d 65 (Fla. 1962); State ex rel. Florida Bar v. Oxford, 127 So.2d 107 (Fla. 1961). During this unduly long period of investigation and prosecution, the accused lawyer is left *639 roaming through the fields of Limbo where dwelt what Dante called "the praiseless and the blameless dead." State v. Oxford, supra.
We have pointedly held that the responsibility for exercising diligence in the prosecution rests with the Bar. When it fails in this regard the penalizing incidents which the accused lawyer suffers from unjust delays, might well supplant more formal judgments as a form of discipline. This is so even though the record shows that the conduct of the lawyer merits discipline. The Florida Bar v. Wagner, 197 So.2d 823 (Fla. 1967).
In the instant matter it has now been seven years since the disciplinary processes were set in motion. It is over ten years since some of the alleged misconduct has occurred. Many letters from highly reputable judges and lawyers have been filed in this Court without objection from the Bar. Hathaway v. The Florida Bar, 184 So.2d 426 (Fla. 1966). They attest to Mr. Randolph's rehabilitation and acceptance in his community as an ethical practitioner. No civil action has ever been instituted against him to recover any funds in relation to the trust. In fact, although invited to do so, the Bar has failed to identify any specific sum of money which respondent is alleged to have appropriated to his own use. Its judgment requiring restitution is therefore so vague that it is unenforceable. Consequently we have the view that the recommendation of the referee more nearly comports with the dictates of justice, the public interest and the welfare of the profession. In lieu of the judgment of the Board of Governors, and for his conduct reflected by the record, the respondent Robert J. Randolph is hereby publicly reprimanded; he is suspended from the practice of law for ninety days and thereafter until he shall pay the costs of this proceeding in the amount of $778.28.
It is so ordered.
ERVIN, C.J., and DREW, ADKINS and BOYD, JJ., concur.